**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

WANDA E. JOHNSON,                    :

     Plaintiff,                    :

vs.                    :     CA 17-0202-MU

NANCY BERRYHILL,                    :
Acting Commissioner of Social Security,
                                        :

     Defendant.


## MEMORANDUM OPINION AND ORDER

Plaintiff brings this action, pursuant to 42 U.S.C. § 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income ("SSI") benefits. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Docs. 21 & 23 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States Magistrate Judge conduct any and all proceedings in this case, . . . order the entry of a final judgment, and conduct all post-judgment proceedings.")). Upon consideration of the administrative record, Plaintiff's brief, the Commissioner's brief, and the arguments of counsel at the February 15, 2018 hearing before the Court, it is determined that the Commissioner's decision denying benefits should be affirmed.[1]

---

[1]     Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Docs. 21 & 23 ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court."))

# I. Procedural Background

Plaintiff filed an application for SSI benefits on May 31, 2011, alleging disability beginning on January 1, 2006. (*See* Tr. 308-16.) Johnson's claim was initially denied on October 19, 2011 (Tr. 98) and, following Plaintiff's initial December 16, 2011 request for a hearing before an Administrative Law Judge ("ALJ") (*see* Tr. 150-53), several hearings were conducted before an ALJ, the last and most relevant to this matter being held on January 8, 2016 (Tr. 45-65). On March 15, 2016, the ALJ issued a decision finding that the claimant was not disabled and, therefore, not entitled to SSI benefits. (Tr. 19-39.) More specifically, the ALJ proceeded to the fifth step of the five-step sequential evaluation process, since Plaintiff had no past relevant work, and determined that Johnson retains the residual functional capacity to perform those light jobs identified by the vocational expert ("VE") during the administrative hearing (Tr. 38-39; *see also* Tr. 27). On or about April 18, 2016, the Plaintiff appealed the ALJ's unfavorable decision to the Appeals Council (Tr. 15); the Appeals Council denied Johnson's request for review on March 27, 2017 (Tr. 1-3). Thus, the hearing decision became the final decision of the Commissioner of Social Security.

Plaintiff alleges disability due to diabetes, hypertension, osteoarthritis, and obesity. The Administrative Law Judge (ALJ) made the following relevant findings:

**1.    The claimant has not engaged in substantial gainful activity since May 12, 2011, the application date (20 CFR 416.971 *et seq.*).**

**2.    The claimant has the following severe impairments: diabetes, hypertension, osteoarthritis and obesity (20 CFR 416.920(c)).**

.    .    .

**3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the**

**listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**

.     .     .

**4.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 416.967(b).**

.     .     .

The claimant has osteoarthritis, diabetes, hypertension, and obesity, which result in the limitation on her ability to perform light work as defined in 20 CFR 416.967(b). Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, the claimant must have the ability to do substantially all of these activities. If the claimant can do light work, the undersigned will determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

With regard to the claimant's osteoarthritis, the record shows she underwent a consultative exam with Elmo Ozment, Jr., M.D., a board[-] certified surgeon, on August 27, 2011. She complained of right arm and right leg problems, which she said a doctor told her was arthritis. She rated her pain as an 11-12/10 on the pain scale. The physical exam showed normal findings with the exception of gait. Dr. Ozment said the claimant walked with a slight limp favoring [the] right lower leg and knee. Her station was normal, but she was poorly coordinated because of pain right knee. Dr. Ozment noted she walked without [an] assistive device and sat comfortably. Her blood pressure was elevated at 180/65, but she said she did not take her medication that day. Her joint range of motion was within normal limits, but she could not flex her right knee without [] having severe pain. Her knee was tender with some swelling, but no crepitus and no effusion. Motor strength was 5/5 in the upper extremities and the left lower extremity, but was 1/5 in the right lower extremity because of knee pain. Sensation was intact throughout the upper and lower extremities.

The claimant had x-rays of the right knee on September 19, 2011, which showed no acute fracture or dislocation. There was narrowing of the

medial knee compartment, small osteophytes along the lateral femoral and tibial condyles as well as the pa[t]ella superiorly. The knee joint was otherwise intact and well-maintained with no knee effusion. The interpreting radiologist's impression was that the x-rays showed spondylitic changes with narrowing of the medial knee compartment.

The claimant saw Dr. Evans on January 19, 2012, for complaints of severe right leg pain and back pain. However, she rated her pain a 0/10 and appeared to be in no acute distress. The physical exam was normal, except Dr. Evans said, "leg abnormalities were seen." However, he did not elaborate on his findings. He diagnosed the claimant with knee joint pain, hypertension, and backache. He prescribed Norvasc, Hyzaar and Clonidine for her blood pressure and Ibuprofen and Ultram to be used as needed for pain. The claimant saw Dr. Evans for a follow up visit on February 8, 2012. She reported her pain was a 3/10, and Dr. Evans noted on physical exam that the "knees showed abnormalities" but he did not go into further detail. He diagnosed the claimant with knee joint pain, hypertension, arthropathy and backache.

The claimant saw Dr. Evans on December 6, 2012, and complained of itchiness on her hands and feet, right knee pain, lack of sleep and bad nerves. At that time, Dr. Evans noted she was taking Lortab 7.5 as needed and Clonidine twice a day. On review of systems, she was not feeling tired or poorly and did not complain of headaches, dyspnea, abdominal pain, back pain, localized joint pain, or depression. She was described as a current smoker. On physical exam, her blood pressure was high at 197/101. She weighed 228 pounds. Dr. Evans did not classify her pain on the pain scale, but she was in no acute distress. The physical exam showed no abnormalities. Dr. Evans diagnosed the claimant with hypertension and morbid obesity. He gave her a Toradol injection and told her to follow up as needed. Dr. Evans prescribed aspirin, Carisoprodol, Ambien, Nexium, Toradol injections, Ultram as needed, Norvasc, Clonidine, Ibuprofen 800 mg as needed, Hyzaar, and Requip.

The claimant complained of headaches, dizziness and problems with both legs on February 5, 2013. On exam, Dr. Evans [noted] abnormalities in the lumbosacral spine, the thighs and leg. However, he did not elaborate further. The sensory and motor exams were normal and the claimant had normal reflexes. She weighed [2]28 pounds and had a BMI of 36.3. He assessed the claimant with elevated blood pressure (138/92) and arthropathy. He gave the claimant Antivert to take as needed, X-rays of the chest, lumbosacral spine, hips and knees were postponed on February 14, 2013.

The claimant underwent a consultative orthopedic exam as requested by her representative, which was performed by William A. Crotwell, III, M.D.

on May 21, 2013. Dr. Crotwell noted the claimant complained of right hand pain and right knee pain for many years with no known injury. She said her last treatment was at the Board of Health by Dr. Evans several months ago when he gave her some pain medications. She told Dr. Crotwell that she has had no MRIs, EMGs, NCVs, CT scans or surgeries. She complained of painful right hand with numbness and tingling in all the fingers, decreased grip strength, and dropping objects. She is left-hand dominant and said her hand goes to sleep at night. She said her hand pain was a 10/10. She also complained of right knee pain on the lateral side of the joint over the patella. She reported pain with hills or stairs and some popping, clicking, locking, catching, and giving way. She said her knee pain is also a 10/10. However, Dr. Crotwell said, "the patient sits there with a very flat affect showing no signs of pain anywhere near that level." In terms of activities of daily living, the claimant told Dr. Crotwell that she ambulates without assistance. She said her daughter does the cooking and cleaning. She said she can only walk 1 or 2 blocks. At the time of the exam, the claimant said she was prescribed Clonidine, aspirin, HCTZ, Ultram, Amlodipine and Motrin.

On physical exam, Dr. Crotwell noted the claimant was able to get up and down off the table without much difficulty. The right knee exam showed decreased range of motion of 0-95 degrees. She had about 10 degrees of varus. He noted the claimant had a minimal effusion, the collateral cruciate was intact, and it had very minimal increased heat. The patella was centralized. The exam of the hands showed sensation was normal by pinprick, and motor was 5/5. Her grip strength was good and she had a negative Phalen's and Tinel's test. X-rays of the right knee showed a varus deformity of about 10 degrees. Dr. Crotwell noted she had joint space narrowing down to about 1 or 2 mm medially, "maybe 1 mm." He said she has moderate to severe arthritis in the medial joint space and mild to moderate patellofemoral arthritis with some spurring.

Dr. Crotwell's diagnostic impression was that the claimant has arthritis of the right knee with associated knee pain and "pain in the hands with no objective evidence of any carpal tunnel or anything wrong with the hands." Dr. Crotwell stated that he thinks the claimant could carry out medium to light and sedentary work and could work an 8-hour workday. He said the claimant's main restrictions would be excessive walking, stairs, hills, inclines, twisting or torqueing with the knee. "However, I think she could carry out activities as listed." Dr. Crotwell recommended conservative treatment at the time and noted she could possibly need some further treatment down the road.

Dr. Crotwell also completed a Physical Capacities Evaluation (PCE) and found the claimant could do the following in an 8-hour workday: sit for 2 hours at a time, for up to 8 hours; stand for 2 hours at a time, for up to 6

hours; walk for 2 hours at a time, for up to 4 hours; lift up to 10 pounds continuously, 20 pounds frequently and 50 pounds occasionally; use both hands for repetitive action such as simple grasping, pushing/pulling (arm controls) and fine manipulation; but not use her feet for repetitive movements as in pushing/pulling of leg controls; and bend, squat, crawl and climb occasionally and reach frequently. Dr. Crotwell assigned total restriction involving unprotected heights, moderate restriction being around moving machinery; mild restriction driving automo[tive] equipment; and no restriction involving exposure to marked changes in temperature, humidity, dust, fumes and gases.

The claimant was hospitalized from February 11-14, 2015 for symptoms related to hypertension and new onset diabetes. She also complained of bilateral knee pain, left ankle pain and right elbow pain. X-rays of the right knee showed osteoarthritis (the patellofemoral space medial compartment are narrowed and there was degenerative spurring of patella, medial femoral condyle and medial tibial plateau), and no acute fracture, destructive bony lesion or erosive changes. X-rays of the right ankle showed degenerative spurring of the medial malleolus and at the insertion of the Achilles tendon. The left elbow x-rays showed degenerative spurring at the insertion of the triceps tendon on the olecranon. However, the musculoskeletal exam showed full range of motion and good muscle strength in all extremities.

The claimant returned to Dr. Evans on February 24, 2014 after last being seen on February 5, 2013. Her blood pressure was elevated at 174/103. She complained of headaches, body pain, panic attacks and needed medication refills. She rated her pain a 3/10. She weighed 223 pounds and had a BMI of 37.1. She was in no acute distress on exam. The musculoskeletal system was normal. Dr. Evans noted her hands, shoulders and thoracic spine "showed abnormalities" but no specific findings were reported. The motor and sensory exams were normal. He assessed her with knee joint pain, elevated blood pressure, esophageal reflux, arthropathy, synovitis and tenosynovitis of the hand/wrist and backache. She was prescribed Ibuprofen and Ultram as needed for pain; Flexeril as needed; Norvasc, Hyzaar, Clonidine and Ativan.

The claimant underwent a consultative exam with Eyston Hunte, M.D. on March 30, 2015. Her complaints mainly dealt with hypertension and diabetes, but she also reported having pain and numbness in the right upper extremity for 2 years. The review of systems was also positive for back pain, difficulty walking, joint pain and RLS. On physical exam, the claimant weighed 200 pounds and her BMI was 35.6. The neurological exam showed normal strength and no motor or sensory deficits in the upper and lower extremities. Grip strength was within normal limits and muscle strength as 4-5/5 in the upper extremities muscles. She had no

swelling in the upper extremities. She had tenderness and crepitus in the right shoulder, but normal range of motion was noted in the shoulders, elbows, wrists and fingers. She complained of pain in the right hip and knee on movement. The lower extremities exam showed no edema and normal sensation. She had a normal gait and was able to squat, toe walk and heel walk normally. Muscle strength was 5/5 in the lower extremities. She was tender to palpation over the right hip. There was slight decreased range of motion on internal and external rotation of the right hip. Crepitus was noted in the knees, worse on the right, and she was tender to palpation on the right knee. However, she had normal range of motion in the knees. She had normal range of motion in the cervical and dorsolumbar spine. She had no spasms, but tenderness was present in the lumbar spine. No motor or sensory deficit was detected. Dr. Hunte assessed the claimant with chronic pain syndrome; osteoarthrosis, localized, involving the lower leg/knees, worse on the right; osteoarthrosis, localized, involving the pelvic region and thigh/right hip; osteoarthrosis, localized, involving the upper arm/right shoulder; hypertension; diabetes mellitus; history of RLS; history of persistent headache; and history of dizziness and giddiness.

Dr. Hunte completed a Medical Source Statement, and found the claimant could do the following activities in an 8-hour work day: lift/carry up to 10 pounds frequently and 20 pounds occasionally; sit for 4 hours at a time, for up to 4 hours per day; stand for 2 hours at a time, for a total of 3 hours per day; walk for 2 hours at a time, for up to 2 hours per day; reach (including overhead) and push/pull occasionally and frequently handle, finger, and feel with the right hand; frequently reach (including overhead), handle, finger, feel and push/pull with the left hand; operate foot controls occasionally with the right foot and frequently with the left foot; climb stairs and ramps, balance, stoop, kneel, crouch and crawl occasionally; never climb ladders or scaffolds; never be exposed to unprotected heights and moving mechanical parts; and occasionally operate a motor vehicle and be exposed to humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme cold, extreme heat and vibrations.

The claimant saw Fethiya Mahmoud, M.D. at Franklin on April 6, 2015 for complaints of non-radiating joint pain with joint tenderness. On review of systems, she reported mild bilateral shoulder stiffness, joint pain, joint tenderness and muscle cramps. She noted the claimant reported tenderness on proximal muscles of the extremities (shoulder and thighs) in the last few weeks. The exam showed tenderness over the bilateral deltoid[s] and quadriceps. She was assessed with myalgia and [] lab studies [were ordered]. She stopped the claimant's Pravastatin and advised her to increase fluid intake. She also gave the claimant Flexeril to take every evening. Labs showed the Rheumatoid factor, sedimentation rate and creatinine kinase levels were within normal limits. The claimant

had no musculoskeletal complaints and had 0/10 pain at her May 8, 2015 visit with Dr. Mahmoud. She also had to musculoskeletal complaints on May 15, 2015 and rated her pain a 0/10.

The claimant complained of right ankle pain, bilateral arm pain and hand pain to Dr. Mahmoud on September 15, 2015. The claimant said the ankle and arm pain started 1 month ago and the hand pain started 2-3 months ago. Associated symptoms included joint tenderness, swelling and weakness, as well as numbness, popping and tingling in the arms and hands. She rated her pain an 8/10. She said her pain was relieved by a Toradol injection given at that visit. The physical exam showed pain during active/passive range of motion of the left shoulder. Left shoulder range of motion was moderately reduced. The right shoulder was normal. The right ankle was tender, warm and had swelling. The bilateral knees had crepitus. She had no edema in the extremities. Sensation was decreased to touch in the toes. The claimant was assessed with new onset acute right ankle swelling, inflammatory vs. crystal arthritis. Dr. Mahmoud ordered lab studies and prescribed Toradol and empiric Ibuprofen. She was assessed with recurrent left shoulder pain associated with stiffness and moderately restricted range of motion due to pain. Dr. Mahmoud also diagnosed the claimant with recurrent knee pain, likely osteoarthritis in both knees. The September 18, 2015 labs showed her uric acid was within normal limits, her Vitamin D was low at 26 (reference range 30-100) and her blood sugar was 94. The right knee x-rays from September 21, 2015 showed arthritic changes[,] primarily in the medial compartment and the patellofemoral joint, but no acute abnormalities. The left shoulder x-rays were negative and showed the acromioclavicular (AC) joint was intact.

Dr. Mahmoud noted the claimant had no improvement in her acute right ankle effusion with Ibuprofen at her October 2, 2015 follow up visit. She had tender swelling over the right ankle with no erythema. No shoulder or knee findings were noted on exam. The uric acid level was 3.4 and she had no source of possible infection. Dr. Mahmoud noted it was likely inflammatory, so she started the claimant on empiric steroids and advised her to elevate her leg and take Ibuprofen for pain. Additional workup, including sedimentation rate, rheumatoid arthritis (RA) profile, antinuclear antibody (ANA) and ankle x-rays, were performed. She was given injections of Kenalog and Toradol. The right ankle x-rays showed soft tissue swelling at the medial ankle as well as a small tibiotalar joint effusion suggesting ankle sprain. No acute fracture or sublaxation was identified. The labs included a high sedimentation rate at 43, a negative ANA, and the RA panel was within normal limits.

On October 20, 2015, Dr. Mahmoud noted the claimant had a tender swollen ankle and mild restriction of joint movement due to pain. She reviewed the lab findings and told the claimant to continue Ibuprofen and

Tramadol for severe pain. She recommended elevation, icing and ankle bracing. She prescribed empiric Keflex for cellulitis, as the swelling did not improve with Ibuprofen and "poorly controlled" diabetes. The claimant's blood sugar was 134 at this visit. No other musculoskeletal findings were reported.

On November 13, 2015, the claimant saw Dr. Mahmoud for musculoskeletal pain that was located in the right ankle and started 1 month ago. The review of systems also noted the claimant had mild left shoulder stiffness occurring for 1 month. The musculoskeletal exam was significant for tender swelling in the right foot/ankle. Dr. Mahmoud assessed the claimant with persistent right ankle effusion for 8 weeks with minimal improvement in swelling and still severe tenderness despite rest, ice, elevation and anti-inflammatory medications. The x-ray showed mild effusion suggesting sprain and the uric acid and RF was normal. She planned to order an MRI[,] switch from Ibuprofen to Naproxen and Tramadol for severe pain[,] and refer to orthopedic surgery for painful dwelling of the right ankle.

In terms of the claimant's osteoarthritis in the right knee and osteoarthrosis of the right hip and right shoulder, the claimant's treatment has been essentially routine and/or conservative in nature, and no surgery has been recommended. In finding that she is capable of performing light work, the undersigned has specifically considered the claimant's arthritis in the knees. The limitation to light work accounts for the right knee x-rays in Exhibits 7F, 13F, 18F and 22F; the slight gait abnormality; positive right knee findings as described by Dr. Ozment in Exhibit 6F and Dr. Crotwell in Exhibit 13F; Dr. Hunte's findings related to the right hip and right knee in Exhibit 16F; and Dr. Mahmoud's finding of crepitus in the bilateral knees in September 2015. During the consultative orthopedic exam, Dr. Crotwell noted the claimant's right knee had some decreased range of motion of 0-95 degrees, a minimal effusion, and very minimal increased heat. No greater limitation is warranted, as Dr. Evans' physical exams consistently documented no abnormalities in the neck, eyes, lungs, cardiovascular system, abdomen or neurological system. The sensory exam and motor exam also showed no abnormalities and her coordination was normal. Dr. Hunte's consultative exam also noted she had normal strength and sensation in the lower extremities. Additionally, she uses no assistive device to ambulate.

The limitation to light work also accounts for the right ankle x-rays showing degenerative spurring during her February 2015 hospitalization. Dr. Mahmoud's records from later 2015 showed complaints of right ankle pain and physical exam findings of tenderness, warmth and swelling. Dr. Mahmoud ruled out crystal arthritis with lab findings of normal uric acid levels. Right ankle x-rays showed findings of mild effusion suggesting

ankle sprain, but no evidence of arthritis. The claimant was treated with pain medication, elevation, icing and ankle bracing. She was later given antibiotics for cellulitis. The available evidence reflects that treatment for this persistent right ankle effusion was ongoing after 2 months of treatment, although the objective findings noted mild abnormalities. Therefore, the limitation to light work can accommodate this condition.

The claimant testified in 2013 that her pain [wa]s a 10/10. She also testified in 2016 that her shoulder pain is a 5/10 and her leg pain is a 5/10. However, this is inconsistent with her pain ratings with Dr. Evans and Dr. Mahmoud. She rated her pain a 0/10 on January 19, 2012, a 3/10 on February 8, 2012, a 1/10 on April 23, 2012 and 3/10 on February 26, 2014 during office visits with Dr. Evans. She rated her pain a 0/10 during her May 8, 2015 visit with Dr. Mahmoud. Additionally, she said her right hand and right knee pain was a 10/10 during her consultative exam with Dr. Crotwell, but he said, "the patient sits there with a very flat affect showing no signs of pain anywhere near that level." Moreover, her pain medications have generally been prescribed to use *as needed*. The claimant testified in 2013 that her pain medications cause side effects[,] including a little nausea, but the claimant has not reported this to her treatment providers. This side effect is mild and would not significantly interfere with her ability to perform work activities.

The claimant testified in 2013 that Dr. Evans said her alleged right-hand problem "may be" arthritis. She reported having problems with her left shoulder, but said she had never sought treatment for it. The evidence received on remand does document complaints of body pain on February 24, 2014 and Dr. Evans noted her hands, shoulders and thoracic spine "showed abnormalities" at that time. However, no specific findings were reported and the motor and sensory exams were normal. During the March 2015 consultative exam with Dr. Hunte, the claimant reported a 2[-]year history of pain and numbness in the right upper extremity. However, the neurological exam showed normal strength, no motor or sensory deficits, normal grip strength and 4-5/5 strength in the upper extremities muscles. She had tenderness and crepitus in the right shoulder, but normal range of motion was noted in the shoulders, elbows, wrists and fingers. On September 15, 2015, Dr. Mahmoud noted the claimant had pain during active/passive range of motion and moderately reduced range of motion of the left shoulder. However, her right shoulder exam was normal. The left shoulder x-rays were negative and showed the AC joint was intact.

Although the claimant alleges problems with her right hand and shoulders, the limitation to light work takes into account Dr. Hunte's diagnosis of osteoarthritis, localized, involving the upper arm/right shoulder and his

findings[,] including 4-5/5 strength and tenderness and crepitus in the right shoulder. However, no greater limitation is warranted, as the neurological exam showed normal strength, no motor or sensory deficits, normal grip strength and normal range of motion was noted in the shoulders, elbows, wrists and fingers. Dr. Ozment noted no sensory abnormalities and reported no significant physical exam findings related to the upper extremities. Additionally, Dr. Crotwell's exam of the hands showed sensation was normal by pinprick, and motor was 5/5. Her grip strength was good and she had a negative Phalen's and Tinel's test. The claimant characterized her shoulder symptoms as "mild" when she saw Dr. Mahmoud on April 6, 2015. She assessed the claimant with myalgia and held the claimant's Pravastatin, as she suspected it could be causing the symptoms. On September 15, 2015, Dr. Mahmoud noted the claimant had pain during active/passive range of motion and moderately reduced range of motion of the left shoulder. However, her right shoulder exam was normal. The left shoulder x-rays were negative and showed the AC joint was intact. Her follow[-]up visits mainly dealt with her right ankle complaints rather than any ongoing shoulder problems.

.    .    .

As noted in the prior decision, Mr. Gardberg objected to Dr. Crotwell's consultative exam stating that Dr. Crotwell's impressions are internally inconsistent. For example, Mr. Gardberg said Dr. Crotwell's findings in terms of the claimant's ability to stand, walk and bend are inconsistent with the x-rays showing moderate to severe arthritis in the medial joint space. Mr. Gardberg also said Dr. Crotwell's assessment is not based on an adequate assessment of all the claimant's diseases, impairments, and complaints described in the claimant's medical history. Thus, Dr. Crotwell's report does not provide evidence that serves as an adequate basis for decision-making and should be accorded no evidentiary weight. However, Dr. Crotwell addressed the claimant's complaints given to him at the consultative exam, which *only* included issues of a musculoskeletal nature. He did not attempt to provide an opinion as to the claimant's hypertension or mental impairments. As noted above, the undersigned has fully accounted for the objective findings in all the x-rays, and consultative physical exams, in Dr. Evans's treatment records[,] and in Dr. Mahmoud's treatment records[,] in finding that the claimant could perform light work.

The undersigned has given some weight to the narrative portion of the consultative exam to the extent that it is generally consistent with the prior consultative exam findings and with the findings in Dr. Evans's treatment records in terms of the claimant's musculoskeletal findings. Dr. Crotwell recommended conservative treatment, which is what was undertaken by Dr. Evans. The undersigned assigns no significant weight to Dr. Crotwell's

opinion in the PCE form. Although some parts of the opinion are somewhat consistent with the residual functional capacity above and Dr. Crotwell stated that the claimant could perform medium to light, light and sedentary work, the undersigned limited the claimant to [] light work based on the objective findings, including x-rays and physical exams as discussed above.

The undersigned gives Dr. Hunte's Medical Source Statement in Exhibit 16F some weight to the extent that it is generally consistent with the ability to perform light work.

.    .    .

**5.     The claimant has no past relevant work (20 CFR 416.965).**

.    .    .

**6.     The claimant was born on November 6, 1965 and was 45 years old, which is defined as a younger individual age 18-49, on the date the application was filed. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 416.963).**

**7.     The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).**

**8.     Transferability of jo skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).**

**9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).**

.    .    .

Based on a residual functional capacity for the full range of light work, considering the claimant's age, education , and work experience, a finding of "not disabled" is directed by Medical-Vocational Rule 202.20 and Rule 202.13.

The undersigned also notes that the vocational expert was asked whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and the residual to perform medium work as defined in 20 CFR 416.967(c) with occasional postural limitations; occasional manipulative limitations; and occasional exposure to hazards, machinery, and heights. The vocational expert testified that given all of

these factors, the individual [would not be able to perform any medium work based on the manipulative limitations but] would be able to perform the requirements of representative [light] occupations such as hostess (DOT 349.667-014), with approximately 66,810 positions in the national economy; lobby attendant (DOT 344.677-014), with approximately 106,860 positions in the national economy; and school bus monitor (DOT 372.667-042), with approximately 81,290 positions in the national economy.

Thus, the vocational expert identified jobs consistent with the ability to perform light work consistent with the residual functional capacity above. This conclusion is supported by SSR 83-10, which states that light work requires the use of arms and hands to grasp, hold and turn objects and generally does not require use of the fingers for fine activities to the extent required in sedentary work[; and] SSRs 83-14 and 85-15, which state that stooping and bending are required occasionally for light work and crouching is not required for light work. SSR 85-15 further states that some limitations in climbing and balancing are not significant for all exertional levels; kneeling and crawling limitations do not have a significant impact on the broad world o[f] work; and restrictions against unprotected heights and proximity to dangerous, moving machinery are not significant at all exertional levels.

**10.     The claimant has not been under a disability, as defined in the Social Security Act, since May 12, 2011, the date the application was filed (20 CFR 416.920(g)).**

(Tr. 22, 26, 27, 28-34, 37-38, 38 & 38-39 (internal citations omitted; emphasis in original)).

## II. Standard of Review and Claims on Appeal

A claimant is entitled to an award of supplemental security income benefits when she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or last for a continuous period of not less than 12 months. *See* 20 C.F.R. § 416.905(a) (2017). In determining whether a claimant has met her burden of proving disability, the Commissioner follows a five-step sequential evaluation process. *See* 20 C.F.R. § 416.920. At step one, if a claimant is performing substantial gainful activity, she is not

disabled. 20 C.F.R. § 416.920(b). At the second step, if a claimant does not have an impairment or combination of impairments that significantly limits her physical or mental ability to do basic work activities (that is, a severe impairment), she is not disabled. 20 C.F.R. § 416.920(c). At step three, if a claimant proves that her impairments meet or medically equal one of the listed impairments set forth in Appendix 1 to Subpart P of Part 404, the claimant will be considered disabled without consideration of age, education and work experience. 20 C.F.R. § 416.920(d). At the fourth step, if the claimant is unable to prove the existence of a listed impairment, she must prove that her physical and/or mental impairments prevent her from performing any past relevant work. 20 C.F.R. § 416.920(f). And at the fifth step, the Commissioner must consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. 20 C.F.R. § 416.920(g).

Plaintiff bears the burden of proof through the first four steps of the sequential evaluation process, *see Bowen v. Yuckert,* 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5, 96 L.Ed.2d 119 (1987), and while the burden of proof shifts to the Commissioner at the fifth step of the process to establish other jobs existing in substantial numbers in the national economy that the claimant can perform,[2] the ultimate burden of proving disability never shifts from the plaintiff, *see, e.g., Green v. Social Security Administration,* 223 Fed.Appx. 915, 923 (11th Cir. May 2, 2007) ("If a claimant proves

---

[2]     *See, e.g., McManus v. Barnhart,* 2004 WL 3316303, *2 (M.D. Fla. Dec. 14, 2004) ("The burden [] temporarily shifts to the Commissioner to demonstrate that 'other work' which the claimant can perform currently exists in the national economy.").

that she is unable to perform her past relevant work, in the fifth step, 'the burden shifts to the Commissioner to determine if there is other work available in significant numbers in the national economy that the claimant is able to perform.' . . . Should the Commissioner 'demonstrate that there are jobs the claimant can perform, the claimant must prove she is unable to perform those jobs in order to be found disabled.'").

The task for the Magistrate Judge is to determine whether the Commissioner's decision to deny claimant benefits, on the basis that she is capable of performing those light jobs identified by the vocational expert, is supported by substantial evidence. Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).[3] Courts are precluded, however, from "deciding the facts anew or re-weighing the evidence." *Davison v. Astrue*, 370 Fed. Appx. 995, 996 (11th Cir. Apr. 1, 2010)[4] (per curiam) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). And, "[e]ven if the evidence preponderates against the Commissioner's findings, [a court] must affirm if the decision reached is supported by substantial evidence." *Id.*, citing *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1158-1159 (11th Cir. 2004).

---

[3]     This Court's review of the Commissioner's application of legal principles, however, is plenary. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

[4]     "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir.R. 36-2.

On appeal to this Court, Johnson asserts one reason why the Commissioner's decision to deny her benefits is in error (*i.e.,* not supported by substantial evidence), namely: the ALJ reversibly erred in failing to discuss the weight given to the consultative examiner's opinion that she would need to nap for up to one hour per day.

**A.** **Did the ALJ Reversibly Err in Failing to Discuss the Weight Given the Consultative Examiner's Opinion that Johnson May Need up to One Hour of Bed Rest Per Day**. On March 30, 2015, Dr. Eyston A. Hunte examined Plaintiff at the request of the Social Security Administration. (*See* Tr. 502-12.) Plaintiff presented with chief complaints of HCVD (that is, hypertensive cardiovascular disease) and diabetes mellitus (type II) (Tr. 509) but also complained of pain in her right hip and knee, as well as pain and numbness in her right upper extremity (*see id.*). Cardiovascular examination was normal and, lymphatically, there was no lymph node enlargement. (*Id.*) Dr. Hunte performed a detailed musculoskeletal examination (Tr. 510-11),[5] all of which was normal, except in the following respects: (1) flexor and extensor muscle strength of the upper extremities was 4-5/5 bilaterally (Tr. 510); (2) tenderness and crepitus was noted in the right shoulder, though all active and passive movements of both shoulder were normal (*id.*); (3) tenderness to palpitation over the right hip was noted, with slight decreased range of motion of the right hip on internal and external rotation (Tr. 511); and (4) tenderness to palpitation of the right knee and crepitus in both knees (worse on the right) was noted, though there was no decreased ROM on testing of the knees (*id.*). Dr. Hunte's written report of examination also contains the following physical capacities

---

[5] In addition, on neurological exam, no sensory or motor deficits were noted. (Tr. 511.)

evaluation: "She was able to get on and off the exam table. She was able to ambulate normally. She does not have an assistive device. She states that that she is able to do her daily activities of living at home. She is not able to drive. She was able to hear and speak normally." (Tr. 511.) In addition, Dr. Hunte completed a Medical Source Statement regarding Johnson's ability to do physical work-related activities (Tr. 503-08), and therein, in relevant measure, noted the Plaintiff can: (1) lift and carry up to 20 pounds occasionally and up to 10 pounds frequently; (2) sit for 4 hours at one time and for a total of 4 hours in an 8-hour workday; (3) stand for 2 hours at one time and for a total of 3 hours in an 8-hour workday; and (4) walk for 2 hours at one time and for 2 hours in an 8-hour workday. (Tr. 502-04.) In addition, Dr. Hunte wrote on the form that Johnson "may need one hrs bed rest/day" in answer to the following question: "If the total time for sitting, standing and walking does not equal or exceed 8 hours, what activity is the individual performing for the rest of the 8 hours?" (Tr. 504.)

In evaluating the opinion evidence, the ALJ in his decision stated that he was according Dr. Hunte's medical source statement "some weight to the extent that it is generally consistent with the ability to perform light work." (Tr. 38.) Plaintiff takes the position that the ALJ's treatment of Dr. Hunte's medical source statement "is problematic because it does not consider Dr. Hunte's statement regarding bed rest. Clearly, 1 hour bed rest per day is not consistent with the ability to perform light work on an ongoing, continual basis. Vocational expert testimony confirms that even an additional 30 minute[s] to 1 hour break two times per week would preclude all work. Tr. at 64. Dr. Hunte's statement, therefore, is pivotal in a finding of disability. The ALJ's

failure to discuss this particular portion of Dr. Hunte's opinion is reversible error." (Doc. 13, at 3.)

There can be little question but that "[w]eighing the opinions and findings of treating, examining, and non-examining physicians is an integral part of the process for determining disability." *Kahle v. Commissioner of Social Sec.,* 845 F.Supp.2d 1262, 1271 (M.D. Fla. 2012). In general, "the opinions of examining physicians are given more weight than those of non-examining physicians, treating physicians are given more weight than those of physicians who examine but do not treat, and the opinions of specialists are given more weight on issues within the area of expertise than those of non-specialists." *McNamee v. Social Sec. Admin.,* 164 Fed.Appx. 919, 923 (11th Cir. Jan. 31, 2006). In assessing the medical evidence, "[t]he ALJ must state with particularity the weight given to different medical opinions and the reasons therefor[,]" *Romeo v. Commissioner of Social Sec.,* 686 Fed.Appx. 731, 732 (11th Cir. Apr. 24, 2017) (citing *Winschel v. Commissioner of Social Sec.,* 631 F.3d 1176, 1179 (11th Cir. 2011)), and the ALJ's stated reasons must be legitimate and supported by the record, *see Tavarez v. Commissioner of Social Sec.,* 638 Fed.Appx. 841, 847 (11th Cir. Jan. 7, 2016) (finding that the "ALJ did not express a legitimate reason supported by the record for giving [the consulting physician's] assessment little weight."); *compare id. with Nyberg v. Commissioner of Social Sec.,* 179 Fed.Appx. 589, 590-591 (11th Cir. May 2, 2006) (unpublished) (recognizing that an ALJ "'must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error.'").

In this instance, the undersigned cannot agree with Plaintiff that the ALJ's analysis of Dr. Hunte's medical source statement is problematic in failing to address specifically the examiner's statement that Johnson "may need one hrs bed rest/day[.]" The ALJ specifically accorded the consultative examiner's medical source statement only "some weight to the extent that it is generally consistent with the ability to perform light work[]" (Tr. 38) [6] and it is clear, as Plaintiff argues in her brief (Doc. 13, at 3), that any need for one hour of bed rest per day (during the course of an 8-hour workday) would be inconsistent with the ability to perform light work on an ongoing and continual basis (*see id.*). In other words, by inference the ALJ "rejected" any portion of Dr. Hunte's opinion inconsistent with the ability to perform light work (*see* Tr. 38) and since the ALJ specifically linked his RFC assessment (for light work) to specific evidence in the record bearing upon Johnson's ability to perform the physical, mental, sensory and other requirements of light work (*compare* Tr. 22-38 *with generally* Tr. 414-26, 432-59, 461, 467-75, 478-80, 483-90 & 493-627),[7] the undersigned simply cannot find that the ALJ reversibly erred in failing to make specific mention of Dr. Hunt's bed rest statement, *see Lewen v. Commissioner of Social Sec.,* 605 Fed.Appx. 967, 969 (11th Cir. Jun. 4, 2015) ("Finally, while the ALJ is required to state the weight afforded to each medical opinion, .

---

[6]     Plaintiff's counsel conceded during oral arguments that Dr. Hunte's RFC assessment falls exertionally within the framework of light work.

[7]     As the Defendant correctly points out in her brief (*see* Doc. 19, at 7-9), the record is replete with evidence that Johnson consistently denied symptoms of fatigue, tiredness or malaise (*see, e.g.,* Tr. 414, 417, 478, 488, 513, 516, 553, 559, 565, 574, 586, 588, 594, 600 & 612); indeed, there is nothing in the medical evidence which would support Dr. Hunte's curious statement that Johnson "may" need one hour of bed rest every day. More specifically, there are no reports in the medical records that Plaintiff's medications cause drowsiness or that she would need daily bed rest because of pain. (*See* Tr. 414-418, 456-459, 461, 467-468, 470-475, 478-480, 483-485, 487-491, 513-517-555, 560-562, 565-577, 580-591, 594-605 & 610-623.)

. . the ALJ is not required to discuss every piece of evidence."). Besides, the statement itself is equivocal ("may") and is also internally inconsistent given that Dr. Hunte was to answer the question preceding his "answer" only if the total time for sitting, standing and walking did not exceed 8 hours (*see* Tr. 504) and a review of the medical source statement clearly reflects findings that Plaintiff can, in an 8-hour workday, sit, stand and walk in excess of 8 hours (*id.*). Thus, this Court **OVERRULES** Plaintiff's sole assignment of error.

There being no other claims of error asserted, the Court finds that the Commissioner's final decision denying Johnson SSI benefits is due to be affirmed.

## CONCLUSION

In light of the foregoing, it is **ORDERED** that the decision of the Commissioner of Social Security denying plaintiff benefits be affirmed.

**DONE** and **ORDERED** this the 2nd day of March, 2018.

s/P. BRADLEY MURRAY
**UNITED STATES MAGISTRATE JUDGE**